IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

JOSHUA D. UNGARSKY          )
                           )
          Plaintiff,        )
                           )
     v.                     )     Case No. 10-3023-CV-S-NKL-SSA
                           )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
                           )
          Defendant.

**O R D E R**

Plaintiff Joshua D. Ungarsky ("Ungarsky") challenges the Social Security Commissioner's ("Commissioner") denial of his application for disability, disability insurance, and supplemental security income benefits under Titles II and XVI of the Social Security Act, as amended ("the Act"). Ungarsky has exhausted his administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g) (2006). Ungarsky argues that the record does not support the ALJ's finding that he was not under a disability because the ALJ failed to accord proper weight to the opinions of medical sources who treated Ungarsky. The facts and arguments that are presented in the parties' briefs will be duplicated here only to the extent necessary.[1] Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Ungarsky's Petition.

---

[1] Portions of the parties' briefs are adopted without quotation designated.

## I.    Factual and Procedural History

Ungarsky was born in 1979, completed the eighth grade, and reads at a fourth grade reading level.  He last consistently worked as a short order cook and dishwasher from 2000-2005.  He also worked as an assembler and briefly through a temporary placement agency.  Ungarsky was twenty-seven years old on January 1, 2007, the date he alleges he became disabled due to back, knee, and kidney problems, dyslexia, attention deficit hyperactivity disorder (ADHD), and bipolar disorder.

At the time of the hearing, Ungarsky was living in a home with his wife and three-year-old daughter.  Ungarsky testified that he is a stay-at home father with his daughter, and that the most he does with his daughter is take her across the street to watch her ride her bike in a parking lot.  He is six feet and one inch in height, weighing approximately two hundred seventy-five pounds at the time of the hearing.  He had gained twenty-five pounds between the time he completed his application in 2007 and the August 2009 hearing approximately two years later.  In his testimony, he attributed his weight gain to Depakote and other medications he had taken to address his mental health issues, though he also testified that he does not take Depakote for his bipolar disorder because it harmed his liver and induced an incoherent state.  Further, according to medical records, he had not been taking his medications as prescribed when he was admitted to the hospital in February 2008 for suicidal and homicidal thoughts.

Ungarsky was first diagnosed with bipolar disorder at age fourteen when he was hospitalized for trying to kill a friend and himself.  After diagnosis, he was placed on

medication, but upon his grandfather's advice, he had stopped taking the medication. [Tr. at 470]. Ungarsky testified that he has tried to hurt himself numerous times since then.

Ungarsky's bipolar symptoms vary daily depending on various stressors he encounters. Symptoms include both manic and non-manic phases. During manic phases, he is unable to sleep, "eat[s] a little bit here and there and . . . just keep[s] going," makes impulsive decisions, cannot think clearly, and has difficulty communicating. Ungarsky also experiences non-manic phases when he is "calm, . . . depressed at some points," and "doesn't want to get out of bed." Stressors also induce Ungarsky to suffer anxiety and panic attacks in varying degrees and frequency.

Some of Ungarsky's stressors include being in groups of people and riding as a passenger in a car. Ungarsky avoids stressors by staying at home with his daughter and only shopping for groceries at night with his wife when the store is not crowded. By arranging his life to avoid stressors, he suffers from fewer panic attacks. In addition to his bipolar symptoms, Ungarsky testified that he hears and sees things and takes medication to remedy this disorder. He also has trouble sleeping, requires two hours in the morning to wake up and function normally, has difficulty concentrating, is easily distracted, and is forgetful and needs reminders from his wife about simple things like appointments or taking his medication.

**B.** **Medical Treatment History of Joshua D. Ungarsky**

Ungarsky was evaluated or treated during the time period of his alleged disability by many physicians and institutions, including St. John's Clinic, Edward Douglas, D.O.,

Kenneth Burstin, Ph.D., Cox Health Systems, Nancy Service, Ph.D., Peggy Vecoli, RNBC, Crystal Powell, PA-C, Burrell Behavioral Health, and Sharol L. McGehee, Psy.D.  What follows is a chronological account of his treatment as reflected in the record before the ALJ.

On February 19, 2007, Ungarsky appeared at St. John's Clinic complaining of daily fatigue, short temper, and losing gaps in time with his memory.  The treating physician, Scott A. Ellis, D.O.,  noted he had been diagnosed with bipolar disorder and ADHD, but had not been on medication for over ten years.  He was assessed as having mood disorder and possible bipolar depression.  Ungarsky told Dr. Ellis that he planned to see a psychologist in the near future.  Before releasing Ungarsky, Dr. Ellis discussed use of medication such as Depakote to help control his mood.

On October 22, 2007, Edward Douglas, D.O., performed a consultative examination of Ungarsky.  At the exam, Ungarsky complained of pain in his left and right shoulders, low back, and both legs and knees.  Dr. Douglas noted that Ungarsky had full muscle strength, good range of motion in both shoulders, and was able to lift thirty pounds and carry it fifteen feet without difficulty.  Dr. Douglas noted that Ungarsky would benefit from increased activity, stretching, weight loss, and improved posture.  He opined that Ungarsky could frequently sit, and constantly stand, walk, lift, carry, stoop, bend, crouch, crawl, climb, handle objects, and reach overhead.  Dr. Douglas noted that Ungarsky's paperwork indicated a possible history of ADHD and a mood disorder, however, Ungarsky did not make any of these claims on Dr. Douglas's paperwork or during the exam.  Further, Ungarsky "did not demonstrate any abnormal behaviors or affects that would indicate a mental dysfunction that

would impair his ability to work." [Tr. at 196]. To determine the presence of any mental disorders, Dr. Douglas noted that a "psychological evaluation should be considered." [Tr. at 196].

On October 25, 2007, Kenneth Burstin, Ph.D., conducted an agency psychiatric review of Ungarsky's records from January 1, 2007 to October 25, 2007. He concluded that insufficient evidence existed to assess Ungarsky's medical portion of the disability determination.

On February 15, 2008, Ungarsky was admitted into the emergency room at Cox Health Systems complaining of auditory hallucinations telling him to kill himself and his ex-girlfriend's boyfriend. He reported that he was not taking his medications as prescribed. Ungarsky improved quickly once medications were started, and Edgar Galinanes, M.D., discharged Ungarsky on February 19, 2008.

On May 8, 2008, Ungarsky was again admitted into the emergency room at Cox Health Systems, complaining of intense thoughts of suicide due to hearing the voice of his abusive grandfather. James Neal, M.D., adjusted Ungarsky's medications, including an increased dosage of Depakote. After spending three days without both suicidal thoughts and hallucinations, Dr. Neal discharged Ungarsky on May 12, 2008, and noted that he had fair to good functioning.

On May 13, 2008, Nancy Service, Ph.D., completed a Medical Source Statement-Mental of Ungarsky. On a checkbox form, Dr. Service noted that Ungarsky was "markedly limited" in various abilities in the following categories: understanding and memory,

sustained concentration and persistence, social interaction, memory, and adaptation. Based on these conclusions, Dr. Service believed that Ungarsky had no capacity to perform any work-related mental activities on a sustained basis such as understanding, remembering, and carrying out simple instructions; making simple work-related decisions; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. Dr. Service treated Ungarsky from June 2, 2008 through September 26, 2008, for a total of three visits. Dr. Service's notes indicate that Ungarsky's problems related to his mood and family issues.

On May 14, 2008, Peggy Vecoli, RNBC, completed a Medical Source Statement-Mental of Ungarsky. The form Nurse Vecoli used was identical to the form used by Dr. Service. Nurse Vecoli noted that Ungarsky was "markedly limited" in various abilities within the same categories as Dr. Service. Based on these conclusions, Nurse Vecoli believed that Ungarsky would be able to understand, remember, and carry out simple instructions on a sustained basis, but otherwise came to the same findings as Dr. Service.

On June 2, 2008, Ungarsky was treated by both Dr. Service and Nurse Vecoli. Dr. Service noted "continued improvement," [Tr. at 221], and Ungarsky informed Nurse Vecoli that his mood was fairly well stabilized and that he was no longer having hallucinations.

On August 14, 2008, Ungarsky called Nurse Vecoli, complaining of hearing voices and seeing little white dots. On that phone call, Nurse Vecoli increased dosage on one of his medications. Ungarsky met with Dr. Service on September 12, 2008, presenting problems of unstable mood and family issues. [Tr. at 222]. On September 15, 2008, Nurse Vecoli saw

6

Ungarsky. She assessed that Ungarsky was feeling more depressed than usual and adjusted his medication. She noted that at the appointment, Ungarsky "denies any problems with anxiety. He has no suicidal, homicidal, or self-harm thoughts. He occasionally sees things in the corner of his eyes. He denies delusional or paranoid thoughts. . . . He also states he takes his medications as prescribed." [Tr. at 252]. Nurse Vecoli's "clinical progress notes" on Ungarsky for both the June and September 2008 visits were co-signed by Mildred Baluyot, M.D. [Tr. at 253, 255]. On September 26, 2008, Ungarsky saw Dr. Service, presenting problems of unstable mood and family issues.

On April 6, 2009, Ungarsky saw Crystal Powell, PA-C at the PatientCare Family Clinic, complaining of bipolar disorder with auditory and visual hallucinations. Because it was beyond Powell's scope of practice [Tr. at 227] Powell referred him to Dr. Brockman, a psychiatrist at Burrell Behavioral Health, for formal evaluation. On May 12, 2009, during Dr. Brockman's psychiatric evaluation, Ungarsky admitted to being off his medication. Dr. Brockman diagnosed Ungarsky with bipolar depression and post-traumatic stress syndrome and prescribed medication. [Tr. at 248]. Ungarsky was resistant to wanting more medication, but Dr. Brockman stressed compliance.

On October 6, 2009, Sharol L. McGehee, Psy.D., conducted a psychological evaluation of Ungarsky. She administered the following tests: clinical interview and mental status exam, personality assessment screener (PAS), and mood disorder questionnaire (MDQ). Based on the mental status exam, Dr. McGehee determined that Ungarsky "was not psychotic." [Tr. at 424]. However, based on Ungarsky's scores on the PAS and MDQ, Dr.

McGehee concluded that Ungarsky is "psychotic" and "experiencing problems with persecutory or delusional thinking and other psychotic phenomena." [Tr. at 426]. She diagnosed Ungarsky with "bipolar disorder, mixed, with psychotic features" and "intermittent explosive disorder." [Tr. at 427].

On October 13, 2009, Dr. McGehee completed a Medical Source Statement-Mental using a copy of the same form completed by Dr. Service and Nurse Vecoli. She concluded that he did not have the capacity to, on a sustained basis, respond appropriately to supervision, co-workers, and usual work situations, or deal with changes in a routine work setting. She did find that he had the capacity to, on a sustained basis, understand, remember, and carry out simple instructions, and make simple work-related decisions. [Tr. at 430].

## C. Vocational Expert Testimony

Cathy Hodgson, a vocational expert, also testified at the hearing. The ALJ asked Dr. Hodgson to assume a hypothetical individual of Ungarsky's age with the same educational and vocational background. The ALJ asked Dr. Hodgson whether any work was available for such an individual who: (1) was capable of sitting for six of eight hours a day; (2) was capable of standing and walking up to six hours a day; (3) was capable of lifting twenty pounds occasionally and ten pounds frequently; (4) required an even surface on which to stand and walk; (5) required a climate-controlled environment; (6) required access to an asthma inhaler on an as-needed basis; (7) was limited to simple, repetitive work with no more than minimal contact with co-workers and supervisors; (8) should never be exposed to climbing, unprotected heights, potentially dangerous machinery, and commercial driving.

8

In response to the hypothetical question, Dr. Hodgson testified that such an individual could perform Ungarsky's past relevant work as a small products assembler as that work is generally performed in the national economy. *See* Dictionary of Occupational Titles (DOT) 739.687-030 (defining "small products assembler").

## II.    Discussion

In reviewing the Commissioner's denial of benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### A.    The ALJ's Decision

To establish his entitlement to benefits, Ungarsky must have shown that he was unable to engage in any substantial gainful activity by reason of a medically determinable impairment or combination of impairments which could be expected to end in death or to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d) (2006). For the purposes of the Act, Ungarsky was not under a "disability" unless his impairment was so severe that he was unable to do his previous work or, considering his age, education, and

work experience, any other kind of substantial gainful work which existed in the national economy. *Id.* The ALJ found that Ungarsky did not meet this burden at any time from January 1, 2007, his onset date, to September 22, 2009, the date of the ALJ's decision.

The ALJ found that Ungarsky had several severe impairments including: bipolar disorder, mixed, with history of psychotic features; history of diagnosis of post-traumatic stress disorder; obesity (with body mass index ranging between 33 and 36.3); right acromioclavicular joint arthrosis (right shoulder); and history of diagnosis of asthma (20 C.F.R. §§ 404.1520(c), 416.920(c)).

However, the ALJ determined that Ungarsky did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. pt. 404, subpt. P, app. 1 (2008). The ALJ further found that Ungarsky retained the residual functional capacity to perform a range of work that involves lifting and carrying twenty pounds occasionally and ten pounds frequently, sitting six to eight hours total during an eight-hour work day, and standing or walking six hours total during an eight-hour work day. However, his capacity prevents him from performing work that involves exposure to or climbing of significant unprotected heights, exposure to potentially dangerous, unguarded moving machinery, or commercial driving. Ungarsky is limited to work involving simple, repetitive job instructions, no public contact, and minimal contact with co-workers and supervisors. The work must be performed on an even surface in a climate-controlled environment reasonably free of noxious smoke, dust, fumes, or lint, with no exposure to extreme levels of vibration, and allows the use of any prescribed inhaler on an as-needed

basis.  The ALJ found that Ungarsky could perform past relevant work as a small products assembler.  Further, the ALJ found that Ungarsky was capable of performing other light unskilled jobs, such as housekeeper/cleaner, which exist in significant numbers in the regional and national economy.

Ungarsky raises only one argument on appeal.  That is, the ALJ's decision is not supported by substantial evidence because the ALJ failed to give sufficient weight to the opinions of Ungarsky's treating medical service providers, Dr. Service and Nurse Vecoli.

## B.  Weight Given to Opinions of Dr. Service and Nurse Vecoli

Ungarsky argues that the ALJ erred in not according proper weight to the opinions provided by Dr. Service and Nurse Vecoli.  Those medical service providers indicated that Ungarsky's "marked" limitations precluded all work, even simple, unskilled work.  Yet, the opinions of Dr. Service and Nurse Vecoli are contained on a checkbox form.  The Eighth Circuit has specifically stated that "[r]esidual functional capacity checklists, though admissible, are entitled to little weight in the evaluation of disability." *Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997) (citing *Gilliam v. Califano*, 620 F.2d 691, 693 (8th Cir. 1980)).  The lessened weight given to Dr. Service's and Nurse Vecoli's opinions by the ALJ was justified because of its checkbox format.

Additionally, the statements made on the forms were conclusory and were made before Ungarsky established a treatment relationship with either Dr. Service or Nurse Vecoli. They may therefore be discounted.  *See* 20 C.F.R. § 404.1527(d), § 416.927(d).  As noted by the ALJ, terms such as "moderate" or "marked" were not defined. The lack of support or explanation

for their conclusions provide little context to the statements of Dr. Service and Nurse Vecoli.

Ungarsky argues, however, that because the terms used on the forms were sufficient for the vocational expert to find that a hypothetical individual could not engage in competitive work on a substantial basis assuming he possessed the limitations Dr. Service or Nurse Vecoli assigned to Ungarsky, then the ALJ should not have discounted their conclusions. This argument is misdirected because there are many reasons why their statements can be discounted, as previously discussed. It is further misdirected because the vocational expert's response provides no medical support for Dr. Service's and Nurse Vecoli's conclusions, the element that the ALJ found lacking. Thus, the vocational expert's testimony sheds no meaningful light on the statements of Dr. Service and Nurse Vecoli.

Most importantly, the ALJ found that the opinions provided by Dr. Service and Nurse Vecoli are inconsistent with the other evidence of record. Both Dr. Service and Nurse Vecoli noted that Ungarsky could not make simple work-related decisions or deal with change in a routine work setting. However, Ungarsky is a stay-at-home father for his three-year-old daughter, an occupation that requires both judgment and an ability to adapt to changes, as well as being stressful and requiring concentration. An ALJ can discount a treating physician's opinion based in part on plaintiff's own testimony about his activities. *See Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009).

The ALJ may have erred in deeming Nurse Vecoli an unacceptable medical source [Tr. at 21], but the ALJ's decision to discount the opinions provided by Dr. Service and Nurse Vecoli is supported by substantial evidence, regardless of this finding. *See Choate v. Barnhart*, 457 F.3d 865 (8th Cir. 2006). .

## C.     Ungarsky's Residual Functional Capacity

The ALJ found that Ungarsky retained the residual functional capacity (RFC) to perform light work activity with additional limitations of no work involving exposure to dangerous machinery or commercial driving. [Tr. at 18]. She found that Ungarsky required work that is performed on an even surface and is performed in a climate-controlled environment reasonably free of noxious smoke, dust, fumes, and lint. [Tr. at 18]. Finally, the ALJ noted that Ungarsky required work involving only simple, repetitive job instructions, involving no public contact and involving minimal contact with co-workers and supervisors. [Tr. at 18]. This is consistent with Dr. McGehee's post-decision findings of Ungarsky's capacity to perform various work-related mental activities on a sustained basis, which Ungarsky urges this Court to consider. [Doc. # 12, at 22].

In making the RFC determination, the ALJ carefully considered the medical evidence and Ungarsky's testimony. [Tr. at 18-21]. As discussed *supra* Part II.B, the ALJ properly discounted the opinions provided by Dr. Service and Nurse Vecoli. Ungarsky does not contest the ALJ's evaluation of the remainder of the medical evidence and testimony. The ALJ undertook a thorough review of the evidence and her RFC determination is based on the record as a whole and is supported by substantial evidence.

The ALJ decided this case at step four of the required sequential evaluation process by finding that Ungarsky could return to his past relevant work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010). At step four, the burden remains on Ungarsky to demonstrate that he is disabled. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).

Because Ungarsky did not meet his burden of making a prima facie showing that he could

not return to his past relevant work, the burden never shifted to the Commissioner, and thus,

vocational expert testimony was not necessary. *See Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.

1996).

## III.    Conclusion

Accordingly, it is hereby

ORDERED that Ungarsky's Petition [Doc. # 3] is DENIED.


                                        s NANETTE K. LAUGHREY
                                        NANETTE K. LAUGHREY
                                        United States District Judge


Dated: October 12, 2010
Jefferson City, Missouri